**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| KEVIN MCCANN, individually and on behalf of all others similarly situated, ) ) ) ) | |
| Plaintiff, ) ) | Case No. |
| v. ) ) ) | |
| THE UCAN COMPANY, a Delaware corporation, ) ) ) | **JURY TRIAL DEMANDED** |
| Defendant. ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff Kevin McCann ("Plaintiff"), by his undersigned attorneys, on behalf of himself and all others similarly situated, makes the following allegations pursuant to the investigation of his counsel and based on information and belief, except as to allegations pertaining to personal knowledge as to himself. Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein and will be available after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action against The UCAN Company ("Defendant" or "UCAN") concerning Defendant's Generation UCAN SuperStarch Drink Mix, Generation UCAN Protein Drink Mix, and UCAN Snack Bars powered by SuperStarch (the "Products").

2.      The UCAN Company advertises, markets, sells and distributes the Products. As alleged with specificity herein, through an extensive, widespread, comprehensive, and uniform nationwide marketing campaign, Defendant claims that the Products are powered by a revolutionary, all-natural carbohydrate called "SuperStarch," which produces "sustained energy," "optimized performance," "enhanced fat burn" and "speedier recovery," all without the harmful and performance-impairing side effects associated with gastrointestinal distress.

3.     In reality, according to laboratory tests and peer-reviewed research, ingesting the Products at recommended rates before and during exercise *does not enhance performance and, in fact, impairs performance due to Product-induced increases in gastrointestinal distress*. Accordingly, Defendant's claims are false, misleading and deceptive.

4.     Plaintiff and the Class described below paid a premium for the Products over comparable sports and fitness nutrition products that did not purport to be made pursuant to a revolutionary ingredient promising a range of false and unsubstantiated fitness and performance benefits.

## JURISDICTION AND VENUE

5.     This Court has original jurisdiction over the claims asserted herein individually and on behalf of the Class pursuant to 28 U.S.C. §1332, as amended in 2005 by the Class Action Fairness Act. Subject matter jurisdiction is proper because: (1) the amount in controversy in this class action exceeds five million dollars, exclusive of interest and costs; and (2) a substantial number of the members of the proposed class are citizens of a state different than that of Defendant.

6.     This Court has personal jurisdiction over Defendant because Defendant conducts substantial business in the State of Illinois, such that it has significant continuous and pervasive contacts with the State of Illinois. Defendant sells its products throughout the United States, including in the State of Illinois. In addition, substantial portions of the wrongdoing alleged in this Complaint took place in the State of Illinois.

7.     Venue is proper pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (c)(2) because Defendant is subject

to this Court's personal jurisdiction.

## PARTIES

8.      Plaintiff Kevin McCann is a resident of Glenview, Illinois and an individual consumer. Plaintiff is a citizen of Illinois. In May of 2018, Plaintiff purchased Defendant's Generation UCAN SuperStarch Drink Mix at a Life Time store located in Skokie, Illinois. Plaintiff suffered an injury in fact caused by the false, fraudulent, unfair, deceptive and misleading practices set forth in this Complaint. Plaintiff relied on Defendant's labeling representations – specifically, the representations regarding "sustained energy," "optimized performance," and "enhanced fat burn" – and would not have purchased the product had he known that the product does not perform as advertised or that the product impairs performance.

9.      Defendant The UCAN Company produces and markets a "family of revolutionary nutrition products," including UCAN SNACK bars, Generation UCAN Superstarch Drink Mix, Generation UCAN Protein Drink Mix powered by SuperStarch, UCAN Hydrate, and various specialty items such as blender bottles, water bottles, and men's and women's apparel. It distributes its products both online and through dozens of fitness-related retail locations in the United States and Canada, and it recently achieved national distribution at Life Time and Sprouts Farmers Market. The company was founded in 2006 and is based in Woodbridge, Connecticut. Defendant The UCAN Company is incorporated in Delaware and has a principal place of business at 15 Research Drive, Suite 3, Woodbridge, Connecticut 06525. Defendant is a citizen of Delaware and Connecticut.

## SUBSTANTIVE ALLEGATIONS

10.     The global market for sports and fitness nutrition supplements is projected to reach US$8.8 billion by 2020, driven by rising consumption of dietary supplements for smart prevention

of diseases. Major factors driving growth in the market include affluent aging baby boomers with increased health awareness, omnipresent fitness and health maintenance trends, focus on leading active lifestyles, and increased participation in sports and fitness activities as measured by higher enrollment in gyms and sports clubs. The United States represents the largest market worldwide, supported by aging baby boomers, increase in gym and health club memberships, and wide availability and easy access to sports and fitness nutrition products at fitness clubs, pharmacies, health food stores, supermarkets and online channels.

11.     Defendant markets its Generation UCAN Products as delivering several "scientifically validated" benefits to people engaged in athletic activity. From the serious beginner to the most highly paid professional, athletes are notorious for their susceptibility to being taken in by products that claim to improve performance. The Generation UCAN marketing materials, including Defendant's website and the Products' labels, have several of the characteristics often associated with nutrition scams that make fabulous claims while trying to sell untested or poorly tested products to vulnerable consumers.

12.     For example, Defendant claims that its Generation UCAN Products are made from a revolutionary carbohydrate called "Superstarch", which Defendant characterizes as a "revolutionary fuel" for energy, sports, and fitness. According to Defendant's website:

> Generation UCAN is powered by SuperStarch, a healthy, natural, gluten-free innovation in carbohydrate nutrition. SuperStarch is a complex carbohydrate (derived from non-GMO corn) that uniquely stabilizes blood sugar and causes virtually no reaction from the fat-storing hormone insulin. It's backed by proven science. Finally there's a healthier, more efficient energy source than sugars, caffeine, or high-carb meals. Originally discovered for children with life-threatening energy imbalances, SuperStarch is a revolutionary fuel being used for ENERGY, SPORTS, and FITNESS.[1]

---

[1]     Generation UCAN, SuperStarch: The Only Energy Source Of Its Kind, https://www.generationuc an.com/super.html (last accessed June 29, 2018).

4

13.     Based on the website's FAQ, Superstarch is, in fact, just corn. More specifically:

SuperStarch is just ground up corn (non-GMO) that is cooked with a unique patent pending natural process. This scientifically proven complex carbohydrate has been shown to break down slowly in your body giving you lasting energy. It's like no other.[2]

14.     A UCAN-authored white paper on Defendant's website provides further detail about

Superstarch:

SuperStarch was originally designed by Scottish researchers in the treatment of a rare genetic disorder called glycogen storage disease, which is characterized by an impaired ability to convert glycogen to glucose in the liver. … Two peer-reviewed scientific studies have confirmed that ingestion of a novel heat-moisture processed cornstarch is superior to conventional treatments in preventing hypoglycemia over extended periods of time in subjects with Glycogen Storage Disease(4, 5). The patent pending proprietary method for making the starch involves a hydrothermal (heat-moisture) treatment process to the native starch which significantly alters the metabolism of the carbohydrates in the body. ...

SuperStarch is not a sugar or fiber. Chemically it is a complex carbohydrate or starch that is completely absorbed. SuperStarch is an extremely large glucose polymer with a molecular weight between 500,000 and 700,000 g/mol. Since molecular weight and osmolality are inversely related, SuperStarch exerts a very low osmotic pressure in the gastrointestinal tract and is rapidly emptied from the stomach into the intestines. Therefore SuperStarch is gentle on the stomach and highly palatable. In the intestines, SuperStarch is semi-resistant to digestion, but is eventually completely absorbed into the bloodstream, thereby giving it a slow time-released absorption profile. Because of the low glycemic impact, there is little stimulation of the hormone insulin following ingestion.[3]

15.     In reality, SuperStarch is merely hydrothermally modified waxy maize starch, also

known as HMS. The starch is processed under conditions of higher than normal moisture (hydro)

and heat (thermal) which changes the chemical properties of the starch molecules. One effect of

---

[2] Generation UCAN, General FAQ's, What is "SuperStarch" and how is it better than anything else on the market?, https://www.generationucan.com/faq.html (last accessed June 29, 2018).

[3] SuperStarch - A Technological Breakthrough in Sports Nutrition Innovation: a white paper by Dr. Jeff Volek, PhD, https://www.generationucan.com/pdf/technical-breakthrough-sports-innovati on.pdf (last accessed June 29, 2018).

this treatment that is of interest to endurance athletes is that the carbohydrates in hydrothermally modified starch have a low glycemic index.

16.     Defendant dubs HMS "Superstarch" as an obvious and transparent marketing ploy. The bottom line regarding HMS (or Superstarch) is that it is supposedly better for performance because it effectively provides a slow release glucose source that is low GI (does not spike glucose much), does not elicit a significant insulin response, and therefore does not suppress fat burning.

17.     In attempt to sell Superstarch, Defendant's website links to numerous white papers purporting to support their claims regarding HMS.[4] These white papers reference "internal experiments" as evidence of HMS's benefits, which are deficient because they do not disclose sufficient information to properly determine whether the research was carried out rigorously and properly. There is no indication that these "internal experiments" were submitted to a reputable journal or survived a rigorous peer-review process. In short, the white papers contain many unsubstantiated claims tricked up to look like science. Moreover, each of the white papers on Defendant's website was authored by Dr. Jeff Volek, PhD ("Dr. Volek"), a member of Defendant's Advisory Board.[5]

18.     Defendant's website also links to a June 2011 article in the journal *Nutrition* about HMS.[6] *Nutrition* is a peer-reviewed journal, and this article constitutes the ***only*** reliable scientific evidence located on Defendant's website (which heavily stresses the scientific basis for their claims

---

[4]     Generation UCAN, UCAN Learn More, https://www.generationucan.com/download.html, (last accessed June 29, 2018).

[5] https://www.generationucan.com/advisory_5.html (last accessed June 29, 2018).

[6] Roberts MD, Lockwood C, Dalbo VJ, Volek J, Kerksick CM. Ingestion of a high-molecular-weight hydrothermally modified waxy maize starch alters metabolic responses to prolonged exercise in trained cyclists. *Nutrition*. 2011; 27:659-665. Available at https://produkty.vladozlatos.com/project/files/pages/1745/nutrition-journal-article.pdf.

about how beneficial the Products are for athletes).[7] That article reported an experiment where nine male cyclists engaged in a 150-minute cycling session at 70% VO2 (max) followed by a 100% VO2 (max) time-trial to exhaustion. Before the exercise session and immediately afterwards the cyclists were given either HMS or maltodextrin. Maltodextrin is a sweetener often used in candy, soda and many other products. HMS and maltodextrin are both sources of carbohydrates.

19.     The study found that the HMS group had a lower initial insulin spike than the maltodextrin group. It also found that the HMS group showed a higher level of fat breakdown during exercise and recovery. Notably however, ***there were no reliable performance differences between the HMS and maltodextrin groups during either the 150-minute exercise period or the time-trial to exhaustion that followed***.

> There were no significant differences between trials with regard to ratings of perceived exertion at each respective time point (data not shown). … Upon completing the 150-min cycling bout, cyclists performed a time trial at 100% VO2peak to fatigue. Paired-samples *t* tests revealed that there was no difference between the HMS and MAL trials (HMS 125 $\pm$ 28 s, MAL 136 $\pm$ 27 s, P = 0.66).

20.     Moreover, the study also revealed ***no reliable differences between the two groups in the level of fat oxidation (i.e., fat burning) during exercise***.

> There were no significant differences between trials with regard to CHO oxidation rates, fat oxidation rates, and/or RER values during the 150-min exercise bout. …
>
> Cyclists tended to oxidize more fat (55-60 min, HMS > MAL, P = 0.08; 85-90 min, HMS > MAL, P = 0.07) during the middle portion of each respective exercise bout when ingesting HMS versus MAL, although these differences were not statistically significant. … Thus, it cannot be definitely concluded that the modest, non-significant increase in fat oxidation that we observed during the HMS condition suggests that muscle glycogen oxidation was spared during the HMS trial.

21.     Despite the contrary evidence above, since launching the Products in 2010,

---

[7] It should be noted that Defendant funded the research project that is reported in this article. Also, the article is co-authored by Dr. Volek.

Defendant has consistently claimed that their HMS produces five core benefits: "sustained energy," "optimized performance," "enhanced fat burn," "speedier recovery" and "no gastric distress."

22.　Three of the claimed benefits appear on the front of the Products' labels, where it prominently states, in enlarged and bolded font, "SUSTAINS ENERGY," "OPTIMIZES PERFORMANCE," AND "ENHANCES FAT BURN." See front of the Products' packaging and labeling below:



23.　These three benefits were prominently displayed on the product Plaintiff purchased, and were relied upon by Plaintiff in making his purchase.

24.　The remaining claimed benefits appear throughout the Products' marketing

8

materials, such as Defendant's website, as shown below:[8] [9]





25.     Defendant's claims regarding "enhanced fat burn" are contradicted by Roberts et al.

---

[8] Generation UCAN, Our Benefits Package, https://www.generationucan.com/benefit.html (last accessed June 13, 2017).
[9] Generation UCAN, The UCAN Family, https://www.generationucan.com/products/ (last accessed June 13, 2017).

(2011) above, which found "no significant differences between trials with regard to . . . fat oxidation rates" and described the increase in fat oxidation as "modest" and "non-significant."

26.     In an effort to sidestep the study's findings regarding fat oxidation rates, Defendant equates lipolysis (fat breakdown and release) with oxidation (actual fat "burning").[10] According to Defendant, "[a]nother revolutionary and patent-pending finding was the increased fat breakdown both during exercise and for an extended period during recovery. This is enabled by the diminished production of insulin that traditionally inhibits the breakdown and oxidation of fat."[11] However, fat breakdown, or lipolysis, is *not* the same as fat burning, and Defendant's conflation of the two is disingenuous and dishonest.

27.     Defendant's claims regarding "optimized performance" are likewise outrageous. Any reasonable consumer exposed to Defendant's website or the Products' labels will understand this as meaning that endurance performance is better if you use Defendant's Products than if you use other carb sources before or during exercise. Roberts et al. (2011) above flatly contradicts this interpretation, as *there was no difference in performance between the HMS group and the maltodextrin group in the study*.

28.     An April 2014 peer-reviewed study also found no significant performance benefits pursuant to pre-exercise ingestion of HMS.

> [S]low digesting modified starches offer the potential for a blunted glucose and insulin response, aiding in the increased utilization of FFAs during exercise; **however, there appears to be no effect on performance versus simple CHO (e.g., glucose or maltodextrin)**.
>
> The effect of modified starches, such as Vitargo® (fast-digesting) and UCAN® (slow-digesting), is dependent primarily on the manner in which the starch is modified. Starches modified for the purpose of rapid digestibility can initiate rapid

---

[10]     Generation UCAN, The Proof Is In The UCAN, https://www.generationucan.com/proof.html (last accessed June 29, 2018).

[11] *Id.*

10

glycogen resynthesis, thus yielding potential performance benefits in repeated exercise. In contrast, starch modification for the purpose of slow-digestibility has been shown to increase fat oxidation during exercise compared to high-GI CHO, thus helping to preserve muscle glycogen; **however, significant performance benefits have not been shown to date**.[12] (emphasis added).

29.     Therefore, contrary to Defendant's representations, scientific evidence reliably indicates that the pre-exercise ingestion of HMS has no beneficial effects on performance versus other carbohydrate sources.

30.     Moreover, current recommendations—including Defendant's dosage recommendations[13]—advise athletes to consume large amounts of carbohydrates both before *and during* prolonged exercise to optimize performance, and studies have found that endurance athletes generally comply with these recommendations.[14] Accordingly, a proper determination of HMS's performance-related benefits should account for both Defendant's dosage recommendations and endurance athletes' current carbohydrate consumption patterns. As such, one would expect that Defendant possesses reliable scientific data linking pre- and during-exercise consumption of HMS to increased performance. Defendant possess nothing of the sort.

31.     In 2016, in consultation with Defendant, the Florida State University Institute of Sports Sciences and Medicine performed a study designed to elucidate the effects of pre- and during-exercise ingestion of HMS on performance. The results of the study were published in a

---

[12] Ormsbee MJ, Bach CW, Baur DA. Pre-Exercise Nutrition: The Role of Macronutrients, Modified Starches and Supplements on Metabolism and Endurance Performance. *Nutrients*. 2014; 6(5):1782-1808. Available at www.mdpi.com/2072-6643/6/5/1782/pdf.
[13]     Generation     UCAN     –     How     to     Use     UCAN     Guide, https://www.generationucan.com/pdf/Generation%20UCAN%20-%20How%20to%20Use%20UCAN%20Guide.pdf (last accessed June 29, 2018).
[14] Baur DA, Vargas F de CS, Bach CW, Garvey JA, Ormsbee MJ. Slow-Absorbing Modified Starch before and during Prolonged Cycling Increases Fat Oxidation and Gastrointestinal Distress without Changing Performance. *Nutrients*. 2016;8(7):392. Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4963868/.

July 2016 article in *Nutrients*, a peer-reviewed journal.[15] According to the article, ***it was the first known study aimed at understanding the effects of pre- and during-exercise consumption of HMS on performance***.

> While prior research reported altered fuel utilization stemming from pre-exercise modified starch ingestion, **the practical value of this starch for endurance athletes who consume carbohydrates both before and during exercise is yet to be examined**. The purpose of this study was to determine the effects of ingesting a hydrothermally-modified starch supplement (HMS) before and during cycling on performance, metabolism, and gastrointestinal discomfort. …

> To our knowledge, **this is the first study to examine the impact of a combined pre- and during-exercise slow-absorbing carbohydrate intervention**.

32.     In other words, despite never having undertaken any studies aimed at understanding the effects of pre- and during-exercise consumption of HMS on performance, and despite having reliable scientific evidence that the pre-exercise consumption of HMS has no effect on performance, Defendant inexplicably centered its marketing campaign around speculative and unsubstantiated performance-related claims, such as "sustained energy," "optimized performance" and "no gastric distress." These claims were not "backed by proven science."

33.     Baur et al. (2016) begins by summarizing the UCAN-funded research project that was reported in the June 2011 *Nutrients* article, while affirming that prior studies failed to replicate current carbohydrate consumption recommendations and dosage patterns for endurance athletes.

> Roberts et al. [14] found that, relative to maltodextrin, ingestion of this modified starch 30 min prior to cycling resulted in very likely increased fat oxidation combined with increased plasma concentrations of free fatty acids (FFA) and glycerol. While endurance capacity in a 100% VO2max time to exhaustion trial following 150 min of cycling (70% VO2max) was unchanged with pre-exercise modified starch, subjects in the study did not consume additional carbohydrate during exercise despite the lengthy nature of the exercise protocol. This may have attenuated any performance benefit stemming from early exercise metabolic alterations. Furthermore, this feeding strategy contrasts with current

---

[15] *Id.*

12

recommendations and current practice among athletes. As such, the purpose of this study was to investigate the impact of consuming a slow-absorbing modified starch supplement both before and during exercise relative to an isocaloric, fast-absorbing carbohydrate solution in trained male athletes.

34.     As indicated by the article's title, not only was there *no increase* in performance benefits pursuant to ingesting HMS before and during prolonged exercise, but ingesting HMS actually *impairs* performance due to HMS-induced increases in gastrointestinal distress.

Despite substantial alterations in metabolism, **performance was unchanged with Iso HMS relative to G**. This finding is in agreement with Roberts et al. (2011) in which endurance capacity in a 100% VO2max time to exhaustion bout following 150 min of submaximal cycling (70% VO2max) was unchanged with pre-exercise ingestion of HMS or maltodextrin (1 g_kg-1) despite evidence for increased fat utilization with HMS. Additionally, a recent study by Oosthuyse et al. (2015) [16] found that, despite enhanced fat oxidation, cycling performance was impaired in a 16 km time trial following a 2 h pre-load (60% Wmax) with during-exercise isomaltulose (63 g_h_1) compared to a maltodextrin/fructose composite. It is possible that enhancing fat oxidation with slow-absorbing carbohydrate (which would presumably be beneficial due to possible glycogen sparing [32]), simply does not translate to any meaningful changes in performance. Indeed, a number of studies have reported no change in time trial performance with a low glycemic index pre-exercise meal despite increased exercise fat oxidation [32,33]. …

Findings from the present study suggest that ingesting HMS at currently-recommended rates before and during exercise maintains euglycemia, increases fat oxidation, and reduces carbohydrate oxidation during exercise in trained male cyclists. However, **HMS has no impact on high-intensity cycling performance compared to fast-absorbing carbohydrates and is associated with gastrointestinal distress. Reducing the intake rate of HMS during exercise does not attenuate the risk of gastrointestinal distress, and it impairs performance. As such, the value of HMS as a during-exercise supplement seems limited**.

35.     Baur et al. (2016) unequivocally shows that Defendant's "optimized performance" and "no gastric distress" claims are misleading and patently false. Despite knowledge of this falsity, Defendant continues to brazenly market the Products as capable of producing "optimized performance" with "no gastric distress."

36.     Baur completed another study in 2018 that showed the Products had absolutely no

13

effect on running performance.[16] That study also demonstrated that the Products showed no difference in subcutaneous abdominal adipose tissue (SCAAT) metabolism,[17] compared to the participants taking a high glycemic value carb product.[18]

37.     Moreover, Defendant's claims regarding "enhanced fat burn" are deceptive and misleading. The HMS-associated GI distress and nausea were induced under load (*i.e.*, during exercise). This is a significant problem for endurance athletes because realizing the benefits of fat oxidation during exercise is simultaneously accompanied by impaired performance due to GI distress.

> Adding gastrointestinal distress as a covariate revealed that changes in nausea and abdominal cramp mediated changes in performance. The influence of gastrointestinal distress increased the difference between G and HMS (Iso and Low) so that adjusting out the effects of gastrointestinal distress attenuates performance differences. Importantly, adjustment for gastrointestinal distress resulted in clear differences becoming unclear (G vs. Low HMS) or likely trivial impairments in performance becoming likely trivial enhancements (Iso HMS vs. G).[19]

38.     Likewise, Defendant's "sustained energy" claim (*i.e.*, lower insulin spike) comes with nausea and GI distress, which eliminates the claimed performance benefits and defeats the purpose of purchasing and consuming "SuperStarch."

> It is also possible that any beneficial metabolic effects stemming from slow-absorbing carbohydrate intake are counterbalanced or overridden by non-metabolic mechanisms. For example, gastrointestinal distress was increased in the present study, and mechanistic analysis revealed this to be a negative, albeit unclear, mediator of performance with Iso HMS vs. G. In support, Oosthuyse et al. (2015) reported that during-cycling isomaltulose ingestion resulted in increased

---

[16] Baur DA, Willingham BD, Smith KA, Kisiolek JN, Morrissey MC, Saracino PG, Ragland TJ, Ormsbee MJ. Adipose Lipolysis Unchanged by Preexercise Carbohydrate Regardless of Glycemic Index. *Med Sci Sports Exerc.* 2018. Abstract available at https://www.ncbi.nlm.nih.gov/pubmed/29166321.

[17] Subcutaneous adipose tissue refers to fat deposits beneath the skin.

[18] Baur et al. (2018).

[19] Baur et al. (2016).

gastrointestinal distress coupled with impaired time trial performance.[20]

39.     In short, endurance athletes who consume HMS face a performance-related tradeoff. In order to realize the claimed benefits of enhanced fat burn and lower insulin spikes, endurance athletes must sacrifice performance. This performance-related tradeoff is material to any reasonable endurance athlete (including Plaintiff and the Class members) and, as such, should have been disclosed on the Products' labels. In any event, the Products' labeling representations are false, misleading, and deceptive because the Products do not produce "optimized performance," and the label fails to disclose that any benefits relating to "enhanced fat burn" and "sustained energy" are accompanied by impaired performance due to gastrointestinal distress. This triad of false statements and material omissions was material to Defendant's strategy of advertising the Products as a performance-enhancing supplement.

40.     Since launching the Products, Defendant has consistently conveyed the very specific message to consumers throughout the United States, including in the State of Illinois, that the Products are powered by a revolutionary, all-natural carbohydrate called SuperStarch, which produces "sustained energy," "optimized performance," enhanced fat burn," "speedier recovery" and "no gastric distress." These boisterous claims have been made and repeated across a variety of media including Defendant's website and online promotional materials, and at the point of purchase, where they cannot be missed by consumers.

41.     Defendant's false and misleading representations are particularly egregious because Defendant sponsored and/or participated in multiple studies regarding the Products, and those studies' results unequivocally show that the Products do not increase performance and are

---

[20] *Id.*

15

associated with the performance-impairing effects of gastrointestinal distress. Yet Defendant continues to label and market the Products as capable of producing "optimized performance."

42.     Moreover, Defendant knew that the claimed benefits of "enhanced fat burn" and "sustained energy" were accompanied by impaired performance due to gastrointestinal distress. Yet Defendant chose to disclose only the beneficial aspects of HMS relative to endurance performance, while failing to disclose those aspects of HMS harmful to performance.

43.     Plaintiff and the members of the Class described below suffered an ascertainable loss in that they paid a premium for the Products over comparable products that do not purport to be made pursuant to a revolutionary ingredient promising a range of false and unsubstantiated fitness and performance benefits and that do not fail to disclose harmful performance-impairing side effects.

44.     Plaintiff and the Class would not have bought Defendant's Products had they known that the Products did not provide the health benefits as advertised on the labels.

45.     Defendant's deceptive statements violate 21 U.S.C. § 343(a)(1), which deems food misbranded when the label contains a statement that is "false or misleading in any particular."

46.     Defendants' fabricated food Products are misbranded under 21 C.F.R. § 101, *et seq.*

47.     Illinois has expressly adopted the federal food labeling requirements as its own: "[a] federal regulation automatically adopted pursuant to this Act takes effect in this State on the date it becomes effective as a Federal regulation." 410 ILCS 620/21. Thus, a violation of federal food labeling laws is an independent violation of Illinois law and actionable as such.

48.     Pursuant to 410 ILCS 620/11, which mirrors 21 U.S.C. § 343(a), "[a] food is misbranded – (a) If its labeling is false or misleading in any particular."

49.     The introduction of misbranded food into interstate commerce is prohibited under

16

The United States Federal Food, Drug, and Cosmetic Act ("FDCA") and all state parallel statutes

cited in this Complaint.

50.     The Illinois Consumer Fraud and Deceptive Business Practices Act also protects

Defendants' consumers, and provides:

> § 2. Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2.

51.     Plaintiff and Class members would not have purchased the Products, or would have

not paid as much for the Products, had they known the truth about the mislabeled and falsely

advertised Products.

## <u>CLASS ACTION ALLEGATIONS</u>

52.     Plaintiff brings this action individually and as representatives of all those similarly

situated, pursuant to Federal Rule of Civil Procedure 23, on behalf of the below-defined Classes:

> **National Class:** All persons in the United States who purchased the Products.

> **Consumer Fraud Multi-State Class:** All persons in the States of California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, and Washington who purchased the Products.[21]

---

[21] The States in the Consumer Fraud Multi-State Class are limited to those States with similar consumer fraud laws under the facts of this case: California (Cal. Bus. & Prof. Code §17200, *et seq.*); Florida (Fla. Stat. §501.201, *et seq.*); Illinois (815 Ill. Comp. Stat. 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws §445.901, *et seq.*); Minnesota (Minn. Stat. §325F.67, *et seq.*); Missouri (Mo. Rev. Stat. 010, *et seq.*); New Jersey (N.J. Stat. §56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law §349, *et seq.*); and Washington (Wash. Rev. Code §19.86.010, *et seq.*).

**Illinois Subclass:** All persons in the State of Illinois who purchased the Products.

Excluded from the Classes are Defendant and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded are any judicial officers presiding over this matter and the members of their immediate families and judicial staff.

53. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

54. **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Classes are so numerous that their individual joinder herein is impracticable. On information and belief, Class members number in the thousands to millions. The precise number of Class members and their addresses are presently unknown to Plaintiff, but may be ascertained from Defendant's books and records. Class members may be notified of the pendency of this action by mail, email, Internet postings, and/or publication.

55. **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Such common questions of law or fact include:

    a. Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive;

    b. Whether Defendant's actions violate the State consumer fraud statutes invoked below; and

    c. Whether Defendant was unjustly enriched at the expense of Plaintiff and Class Members.

56.     Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and the other Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

57.     **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the claims of the other members of the Classes because, among other things, all Class members were comparably injured through Defendant's uniform misconduct described above. Further, there are no defenses available to Defendant that are unique to Plaintiff.

58.     **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other Class members he seeks to represent, he has retained counsel competent and experienced in complex class action litigation, and he will prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiff and his counsel.

59.     **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a representative class action, members of the Classes would continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue hardship and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant. The proposed Classes thus satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

60.     **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole.

61.     **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other members of the Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress for Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

### CLAIMS ALLEGED

### COUNT I
**Violation Of State Consumer Fraud Acts**
**(On Behalf Of The Multi-State Class)**

62.     Plaintiff incorporates paragraphs 1 through 61 as if fully set forth herein.

63.     The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class[22]

---

[22] California (Cal. Bus. & Prof. Code §17200, *et seq.*); Florida (Fla. Stat. §501.201, *et seq.*); Illinois  (815 Ill. Comp. Stat. 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich.  Comp. Laws §445.901, *et seq.*); Minnesota (Minn. Stat. §325F.67, *et seq.*); Missouri (Mo. Rev. Stat.  010, *et seq.*); New Jersey (N.J. Stat. §56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law §349, *et seq.*); and Washington (Wash. Rev. Code §19.86.010, *et seq.*).

prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

64.      Defendant intended that Plaintiff and each of the other members of the Consumer Fraud Multi-State Class would rely upon their deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

65.      Because of Defendant's use or employment of unfair or deceptive acts or business practices, Plaintiff and each of the other members of the Consumer Fraud Multi-State Class have sustained damages in an amount to be proven at trial.

66.      In addition, Defendant's conduct showed malice, motive, and reckless disregard of the truth such that an award of punitive damages is appropriate.

## COUNT II
### Violation Of The Illinois Consumer Fraud Act
### (In The Alternative To Count I And On Behalf Of The Illinois Subclass)

67.      Plaintiff incorporates paragraphs 1 through 61 as if fully set forth herein.

68.      Plaintiff brings this claim individually and on behalf of members of the Class and Illinois Subclass against Defendant.

69.      The Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA"), 815 ILCS 505/1, *et seq.*, prohibits the use of unfair or deceptive business practices in the conduct of trade or commerce. The ICFA is to be liberally construed to effectuate its purpose.

70.      Defendant's conduct in representing the benefits of its Products constitute the act, use and employment of deception, fraud, false pretenses, false promises, misrepresentation, and unfair practices in the conduct of Defendant's trade or commerce.

71.      Defendant intended that Plaintiff and the Class Members would rely on their representations. Defendant intended to prey on these representations.

72.      The misrepresentations are material because they concern the type of information

21

upon which a reasonable consumer would be expected to rely in making a decision whether to purchase the Products.

73. Because Defendant is in the business of selling supplement products, Defendant committed the unfair and deceptive acts in the conduct of their trade and commerce.

74. Defendant's practice of misrepresenting the Products is also unfair because it offends public policy and is immoral, unethical, and unscrupulous in that Defendant has misled Illinois consumers about the very efficacy and purpose of the Products. Misrepresenting the Products offends the public's expectation to be told the truth about the products they are buying.

75. Defendant's conduct also causes substantial injury to consumers. Not only is Defendant misleading consumers into purchasing Products that are not what they purport to be, but consumers are also paying for and ingesting Products with no value or benefit.

76. Because the Products have no efficacy, the Products as sold were worth less than the Products as represented, and Plaintiff and Class Members paid a premium for them. Had they known the truth, Plaintiff and Class Members would not have purchased the Products or would have paid less for them.

77. The Products' labeling deceived Plaintiff and Class Members, who suffered economic damages as a proximate result of Defendant's unlawful conduct as alleged herein, including the difference between the Products' actual value versus the Products' value had the advertised claims been true.

78. Defendant's conduct showed malice, motive, and reckless disregard of the truth such that an award of punitive damages is appropriate.

79. Plaintiff also seeks to enjoin Defendant's ongoing deceptive practices relating to its claims on the Products' labels and advertising.

## COUNT III
### Unjust Enrichment
### (On Behalf Of The National Class)

80.    Plaintiff incorporates paragraphs 1 through 61 as if fully set forth herein.

81.    Plaintiff and the other members of the National Class conferred benefits on Defendant by purchasing the Products.

82.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and the National Class members' purchase of the Products. Retention of those monies under these circumstances is unjust and inequitable because Defendant's labeling of the Products misled consumers, causing injuries to Plaintiff and the National Class because they would have not purchased the Products had they known the truth about the Products' labeling claims.

83.    Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and the National Class is unjust and inequitable, Defendant must pay restitution to Plaintiff and the National Class for their unjust enrichment, as ordered by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays for judgment against Defendant The UCAN Company as follows:

(a)    An Order certifying the Class described herein and appointing Plaintiff as Class Representative and his attorneys as Class Counsel;

(b)    Compensatory damages in favor of Plaintiff and the other members of the Class and against Defendant;

(c)    Punitive and/or exemplary damages, reasonable attorneys' fees, filing fees, and the reasonable costs of suit;

23

(d)     Other appropriate legal or equitable relief; and

(e)     Such other and further relief as the Court deems just and proper.

Dated: July 11, 2018                          Respectfully submitted,

                                              By: */s/ Joseph J. Siprut*                    
                                              Joseph J. Siprut
                                              *jsiprut@siprut.com*
                                              Ke Liu
                                              *kliu@siprut.com*
                                              **SIPRUT PC**
                                              17 N. State Street
                                              Suite 1600
                                              Chicago, Illinois 60602
                                              Phone: 312.236.0000
                                              Fax: 312.878.1342

                                              Nick Suciu III
                                              *nicksuciu@bmslawyers.com*
                                              **BARBAT, MANSOUR & SUCIU PLLC**
                                              1644 Bracken Rd.
                                              Bloomfield Hills, Michigan 48302
                                              313.303.3472

                                              Jason J. Thompson
                                              Rod M. Johnston
                                              SOMMERS SCHWARTZ, P.C.
                                              One Towne Square, 17th Floor
                                              Southfield, Michigan 48076
                                              (248) 355-0300
                                              jthompson@sommerspc.com
                                              rjohnston@sommerspc.com

                                              ***Counsel For Plaintiff***
                                              ***And The Proposed Putative Classes***